No. 31,800

WILLIAM R. SMITH, *Appellant,* v. WILLIAM S. STEINRAUF, as Police Judge, etc., and MAURICE J. LEONARD, as Chief of Police, etc., *Appellees.*

(36 P. 2d 995)

Opinion filed November 3, 1934.

*C. J. Putt,* of Topeka, for the appellant; *William R. Smith,* of Topeka, *pro se.*

*W. E. Atchison* and *Henry D. Dangerfield,* both of Topeka, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one to enjoin enforcement against plaintiff of an ordinance of the city of Topeka relating to the keeping of cats. A demurrer to the petition was sustained, and plaintiff appeals. A copy of the ordinance is appended hereto.

Defendants are the chief of police and the police judge of the city. The petition alleged plaintiff kept more than five cats more than six months old, and, at the argument, it was stated the number was eight. The petition alleged that. unless enforcement of the ordinance against plaintiff was enjoined, he would be arrested and fined, and the demurrer admitted these facts.

The petition alleged plaintiff's cats are kept at his residence, consisting of a two-story, nine-room dwelling house, situated on three lots at the corner of Eleventh and Harrison streets, a residential portion of the city of Topeka. There is a basement under the entire house, which contains the laundry and four additional rooms. All of plaintiff's cats were born in the residence described, were never permitted to run at large, and had not been at any time outside the residence. The cats were reared as pets, were well trained, and

neither interfere with nor annoy any person living within 250 feet of plaintiff's residence.

There is no question the city has power to pass ordinances denouncing conditions which interfere with the general health, comfort and security, and consequently may regulate the keeping of animals within the city. The keeping of animals may even be forbidden when the circumstances are such that the keeping constitutes a nuisance, but a city may not proscribe as a nuisance a condition which is not a nuisance in fact.

Not so long ago city dwellers kept driving horses. The alleys of residential districts were lined with barns. Especially in certain kinds of weather, characteristic odors would be quite pervading. Conditions could be regulated, but to forbid the keeping of a horse would have been unthinkable. One dog may be a nuisance in a neighborhood, but an ordinance forbidding the keeping of any dog would now be unthinkable. Wully killed sheep; the gray dog had no such atavistic lapses. The result is, ordinances must be prepared with discrimination, having regard to the nature of the animal and the purpose, manner and consequences of its keeping. Unless this be done, it may be discovered property rights have been invaded.

While at common law the concession was made that a dog was property, Blackstone said it was a "base property," and that pretty effectively classified dogs in the law for a long time.

In the case of *Harrington v. Miles*, 11 Kan. 480, decided in 1873, the subject of property in dogs was considered in the light of the statutes of the state, and of the common law. In the opinion it was said:

"It seems impossible in the light of these legislative and judicial expressions to decide that a dog is not property, nor a thing of value. . . . We are constrained therefore to hold that a dog is property; that the stealing of one is larceny; and that words charging the stealing of a dog are actionable *per se.*" (p. 484.)

In the opinion in the case of *City of Independence v. Trouvalle*, 15 Kan. 70, decided in 1875, it was said, however, property in dogs was of such a low character it was hardly considered property at all. In the case of *State, ex rel., v. City of Topeka*, 36 Kan. 76, 12 Pac. 310, decided in 1886, it was conceded the dog was the subject of property, but it was stated again the property was not of high character. Blackstone was cited, and it was said dogs seldom have market value.

At the present time, the breeding of what may be called standard breeds of dogs is engaged in as a gainful occupation by many persons, and prices are quoted in their advertisements. The same is true of cats. Good quality kittens of favorite breeds, without pedigree, may be had for five dollars each; with pedigree, ten to twenty-five dollars.

The subject of property in dogs is treated in 3 C. J. 16 and pages following, where decisions are collated. The text concludes with the statement that the drift of modern decisions and of legislation is toward the rule that the dog is as much the subject of absolute property right as are other domestic animals.

It was doubtless fortunate for the cat that, while the judiciary were "kickin' the dog around," the cat kept out of court. In "The Fireside Sphinx," by Agnes Repplier, appears the following:

"In the year of 1865 a *juge de paix* of Fontainebleau, from whom several householders had demanded legal protection for their cats, pronounced this admirable judgment:

" 'That the domestic cat is not a thing of naught, but the property of its master, and as such, entitled to the shelter of the law; . . .' " (p. 179.)

In the case of *Thurston v. Carter*, 112 Me. 361 (1914), plaintiff sued defendant for damages for killing plaintiff's foxhound. Defendant justified on the ground the dog was chasing and worrying defendant's cat, on defendant's land. A verdict was directed for defendant, and plaintiff excepted. On appeal it was held a cat is a domestic animal, the subject of absolute property, and the exception was overruled.

The story of the cat, authentic and legendary, has been told by experts, scientific, historical, and literary, and will not be repeated here. "The Fireside Sphinx" just referred to is a fascinating book. Helen M. Winslow's book, "Concerning Cats," is pleasing and informative. Carl Van Vechten's book, "The Tiger in the House" (1920), is a monument to the cat species. A short account of the cat as a marketable animal, of breeds of cats, of breeding associations, cat societies and cat shows, and of the cat in literature and art, by Nelson Antrim Crawford, of Topeka, Kan., appears in "The American Mercury," volume 29, page 327 (1933).

One period of cat history must be noted.

In the witches' cauldron scene in "Macbeth," the first signal that it was time the witches should begin their obscene rite was given by a cat: "Thrice the brinded cat hath mew'd."

From deification in Egypt, the cat fell in the middle ages to the lowest depths of superstitious disrepute. The cat was the consort and agent of witches, and sometimes Satan himself took the form of a cat. Accounts of the cat's weird wickedness are found in the folklore of all the countries of Europe. That was natural enough when belief in association and compact with the Prince of the Power of Darkness was part of the common culture. But the astounding thing is that superstitions regarding the cat and its potency for evil persist and govern human conduct to this day. Woe to the cat which must be dealt with by some court or legislative body, with this survival lurking in the back of its mind.

In the case of *Sentell v. New Orleans &c. Railroad Co.,* 166 U. S. 698, decided in 1897, the court said the fact dogs are without the protection of the criminal laws shows that "property in dogs is of an imperfect or qualified nature." (p. 701.) In the course of the opinion the court said that dogs are not good for food, they cannot be used as draft animals except to a limited extent, they are subject to attacks of madness (hydrophobia being specified), and they have serious infirmities of temper which make them public nuisances, without right to life. That put dogs nicely in the same class with human beings, and so was disparaging to the dog to a certain extent. He should not be classified, on the score of depravity, with our Barrows and Dillingers and Floyds. The court said, however, dogs should be classified with cats and monkeys and similar animals "kept for pleasure, curiosity, or caprice." (p. 701.)

The framers of the constitution of this state had gotten away from the dour notion that mundane happiness is sinful, and the first section of the bill of rights reads:

"All men are possessed of equal and inalienable natural rights, among which are life, liberty, and the pursuit of happiness."

The court interprets that condition to mental and moral health which is called happiness, to include pleasure; and the court cannot subscribe to the view that things which, whether animate or inanimate, minister merely to happiness in the home, may not have full protection of the law as property. There may be in a city a superfluity of curs of low degree and alley cats, but there are others. Dogs may not be considered as fundamentally just dogs, and cats as just cats, and the legislation which fails to discriminate may be unsound.

It is conceded the cat has valuable uses: to catch mice and rats in the home, in storage buildings, in manufacturing plants, in post offices and other public buildings, about wharves, on ships, and elsewhere. The cat may have other uses.

Charles E. Bullard is a celebrated photographer of cats. His copyrighted cat photographs are sold in great numbers every year in all large cities throughout the United States. His work was done in his home, and he kept quite a menagerie of cats, trained to pose. Two of the best were "Punch" and "Judy." They posed for the famous photograph of an old cat, wearing spectacles, taking a photograph of a kitten. The kitten sat in a chair, looking upward quite angelically, while the old cat looked intently around one side of the camera, with her paw extended as if on the shutter release. What nonsense it would be to declare that Bullard had only a base, qualified, imperfect property in those cats, joint creators with him of his fame and his comfortable income.

Progress of the law consists largely in recognition as worthy of legal protection, of interests not previously protected at all and, aside from the uses referred to, the worth of the cat as a contributor to the felicity of the home is alone sufficient to require that it be regarded as property of the owner in the full sense of the term property.

The enjoyment of private property is, of course, subject to regulation in the interest of the general welfare, but regulation must be reasonable, and must be according to due process of law.

The legislature has authorized cities of the first class to pass ordinances to regulate or prevent the running at large of certain animals, including dogs and cats. The ordinance under consideration does not relate to running at large. It relates to keeping cats within a measured distance from another's dwelling. Plaintiff contends the authority of the city is limited to regulating or prohibiting running at large. The court is of the opinion keeping of animals may result in a nuisance, and the legislature has granted the city power to suppress nuisances.

The city has conclusively determined by the ordinance that the keeping of more than five cats is a nuisance. The facts alleged in the petition and admitted by the demurrer negative nuisance, but the facts could not be proved as a defense to a prosecution for violation of the ordinance. Regardless of the facts, plaintiff is subject to heavy fine and to imprisonment unless he pays the fine.

What makes a cat a nuisance? The city resorts to the analogy of the dog—noise, stench, and lack of privacy of conduct in the mating season. It is doubtful if the latter trait may be attributed to the nocturnal cat, but the others may.

In framing the ordinance, the city applied the principle of classification by number: five cats, no nuisance; six cats, nuisance. Surely none but the most sensitive ear and nose could tell the difference, and the difference may not be determined on the basis of what may offend the fastidious. So the problem of nuisance or no nuisance was solved as if according to the following mathematical formula: $X =$ maximum amount of nuisance ordinary folks must endure. To find the value of $X$, multiply the quantity of discomfort one cat produces by five. This computation gives the cat the benefit of the doubt because the increment produced by associate relation is disregarded.

Number is often a proper basis of classification. Cities are classified in that way, not because a city having a population of 19,990 should be governed differently from a city having a population of 20,010, but because a large city should have powers not possessed by a small city, and a line must be drawn. We have no such case here. There is no sound basis, independently of actual conditions and consequences of keeping, for making a discrimination between keepers, and the ordinance is void.

The ordinance is void for another reason: The keeper of a cat hospital is expressly exempt without regard to number kept, and without regard to conditions. The temporary keeping of a cat for observation or treatment has nothing to do with total number which may be continually kept.

The judgment of the district court is reversed, and the cause is remanded with direction to grant the injunction prayed for.

---

### ORDINANCE NO. 6325

An Ordinance relating to and regulating the keeping of dogs and cats in the city of Topeka, and providing penalties for the violation of this ordinance.

*Be it ordained by the Board of Commissioners of the city of Topeka.*

Section 1. That it shall be unlawful for any person, firm or corporation to keep more than five dogs or five cats over the age of six months each, in any place in said city of Topeka within two hundred and fifty feet of any dwelling house in use or occupied by human beings other than a dwelling house be-

longing to the owner of such dogs or cats: *Provided, however,* That the ordinance shall not apply to dog or cat hospitals where dogs or cats are temporarily detained for observation or treatment.

Sec. 2. That any person, firm or corporation violating any of the provisions of this ordinance shall be deemed guilty ·of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than $25 nor more than $50 for each offense; each and every day's violation of this provision of this ordinance shall be deemed a separate and distinct offense.

Sec. 3. That this ordinance shall take effect and be in force from and after the passage, approval, and publication in the official city paper.

Passed by the board of commissioners July 18, 1933.

Approved July 18, 1933.

Published in the Topeka *State Journal* July 19, 1933.